I now call our final case for argument, 20-1171, Simio v. FlexSim Software Products. Mr. Oberdick, whenever you're ready. Thank you, Your Honor, and may it please the Court. Simio respectfully submits that the District Court erred below in dismissing Simio's complaint and invalidating Simio's twice-examined 468 patent based on holdings that the claims of the 468 patent are, one, not directed to a machine, that's in the four categories test under Section 101, and that the claims are otherwise abstract under Section 101. In this respect, we respectfully submit that the lower court erred by not allowing for full claim construction on those issues and by not resolving factual disputes or inferences in favor of Simio. Well, let me ask you, let me just interrupt you because time is short. There's a lot of ink spilled over this machine question, but it seems more appropriate for me to just focus on the alternative grounds of the District Court judge, which is this is an abstract idea and contains no inventive concept. So along those lines, looking at your claim, what specifically about applying graphical processes to object-oriented program improves the functioning of a computer as opposed to just these things more user-friendly, which is what the specification seems to talk about? Your Honor, with respect to your question, let me draw your attention to the portion of the claims that the Patent Office focused on in allowing or granting the patent under two examinations. That's the reference to an executable process to add a new behavior directly to an object instance. Let me give you an example of what is there to the extent that the invention here is being used to model a factory floor and the transit of goods through that floor. You may have an instance where an object, a digital object, is created by the invention through a graphical process that could be a conveyor. That conveyor could have particular behaviors that are initially created for that object, but a user may want to modify the behavior for one instance, one example, or use through the simulation model and have that conveyor have a sorting process. Here, the claims describe the process whereby that behavior can be adjusted for that one instance and then without programming, without the need for computer programming, by use of the digital object and the process, the executable process for that benefit. In terms of your question as to improvement, the patent itself, the specification, talks at column four as to how the invention is designed to simplify model building, that it is a departure from the design of existing model tools. Yes, but I don't have the site to the spec, but the spec also acknowledges that it's directed towards decades-old computer programming practice of substituting text-based coding with graphical processing. The spec acknowledges this has been widespread since the 1980s, and the other process has been around since the early 60s. Since these have been around for decades, I guess my question remains, how does this final limitation that we've been talking about improve the functionality of a computer? It improves the functionality of the computer as that computer is applied to the simulation modeling system. We have in the record a notation and an acknowledgment by counsel at oral argument below that there is novelty here. I acknowledge that doesn't apply to step one of ALICE, but the step two analysis does take into account novelty. Well, if it's novelty, it doesn't necessarily consume and include the abstract idea, correct? Correct, Your Honor, correct. In terms of improvement, we have also FlexM touting its own alleged infringing product by use of the words revolutionary and the use of process flow to avoid programming and to simplify the simulation process. Counsel, this is Judge Stoll. I want to get back to that last limitation of claim one, which I'm going to refer to as the add-on limitation. I think that's what it's referred to in the specification. Is that add-on limitation the idea of giving a new behavior to an object instance without changing the object definition? That is something, as I understand it, that would in prior art object orientation methods, even maybe not for developing simulation models, but generally in prior art object orientation methods. Do you agree with that?  One of the things we look at is whether, for example, the background of your invention admits that certain object-oriented programming techniques were known. For example, in column one, the bottom line 60 through 68, it talks about subclassing. In column two, lines one through five, it talks about developing has-they relationships and that these things are conventional things that were available in object-oriented type programming. My question to you is, is the add-on limitation described in the last element of claim one one of these types of programming techniques that was known in object-oriented programming? Set aside, please, the simulation model application in which your claims are directed. Understood, Your Honor. As your question anticipated, or at least your question asked, was it a known programming technique, I would say yes. The idea of altering a behavior of an object through programming was known. Here, in contrast, we have the use of the process. It's described either as the graphical process or the executable process, using a visual flow chart as a means whereby that behavior can be modified and whereby you do not, as a user, need to know and understand and implement software programming. So, yes, Your Honor, the idea of using programming to alter a behavior was known. The idea of using a visual process, the flow chart process, to modify the behavior as part of that simulation system was not known. That is what is described as revolutionary by FlexM. And at Column 4, Appendix 54 of the specification is referenced as simplifying the model, making it dramatically easier. And if we go further to the specification at Column 15 at the top of 16, that add-on process is described as a much more powerful concept because it allows and this is more specific to simulation. It allows the add-on process to model process delays that span simulated time. So here you have a very... Excuse me for a minute. It's all right. In Column 15, there is some discussion of, I guess, the add-on logic where it says, in many cases, it would be more desirable to add the logic to a specific instance of the object without having to create a new object definition. But I don't see anything else that talks about why this is particularly desirable or advantageous in a simulation environment. Am I missing something? Well, if I jump to the bottom of that, in the simulation environment, I was reading the very last paragraph that ends on 15 and runs to the top of 16, where it is specific to a simulation environment. It talks about the add-on process being a much more powerful concept because in that simulation context, it can model delays that span simulated time and not just at one specific instant in time. Can I move you on to just before your time runs out to a question about this amendment that you sought? As I can understand it, there weren't any facts in your proposed amended complaint that couldn't have been alleged before the deadline to amend. Is that correct? I agree, Your Honor, yes. So where was the good cause for not amending before the deadline? Your Honor, we submit respectfully that the interplay between a pending motion to dismiss in our case as well as the scheduling order created overlaying deadlines. We did have a motion to amend, but while we also had the motion to dismiss pending, the motion to dismiss provided instruction to us as to the view of the district court judge as to what the claims did and did not say. We did not have the benefit of the district judge's view at the time the deadline was approaching. These same issues were brought before the district judge when we filed our motion for leave. The judge below did not deny that motion on the grounds that it was untimely or that anything had been waived. The sole basis for denial was futility. That is, the district court did look at the allegations in the complaint. Right. No, I understand the basis upon which he ruled. I was just asking you about the alternative argument. But I think I heard the bell ring. Am I right, Michael? No, there's another 30 seconds remaining, Your Honor, before rebuttal. Sorry. Sorry. Please proceed. I'm sorry. It's all right, Your Honor. I'll just restate. In the context of this case, the procedural context, we submit that we still have the ability to request leave after having the benefit of the district court's view of the motion to dismiss and the arguments advanced before. And I will, at this point, pause and allow my friend to respond. Thank you very much. Is it Mr. Miller with us this morning? Yes, Your Honor. Thank you. Good morning. Good morning. May it please the Court. I want to begin with a brief focus on part of the four categories argument, and that is the Section 101 does not permit claiming software as a product unless it is in a tangible form. And I think the primary argument to focus on here is on page 19 of the red brief. We argued that these claims are broad enough to cover any copy of the software, including an intangible embodiment of the software that's being transmitted by a digital signal. And that happens when you download the software from either Simio or FlexSim. You go to their website, you download the software. The software travels from their server to your computer, and the only thing either one of these companies is selling is that software in that signal coming to your computer. They don't sell computers with the software on them. Simio in the gray brief. Excuse me. This is Judge Stoll. What about the preamble? Do I have to agree with you that the preamble doesn't have weight in order to agree with this argument you're making now? I don't think you have to say it doesn't have weight. I don't think it's a limitation, and I think that's based on both preambles. Excuse me. I don't understand what you mean by it has weight, but it's not a limitation. I think those things are synonymous, so I'm confused. Okay. Well, my argument is this. The preamble doesn't refer to a computer in a way that would indicate that it's a component of the system. For example, let's go through the three portions of the preamble. It starts with a computer-based system. That is not the same thing as a computer system. The word based has weight. It means something. And software, a pure software product, is drafted and created based on how computers function. The software itself isn't a physical computing device later on. Okay. So the next portion of the preamble is that phrase, but it starts with the word for. For developing simulation models on a physical computer device. That is a clear, unambiguous statement of the intended use of this system. It is not a statement of what the system is comprised of. That's why it says for. It's your view that the language developing simulation models is the only thing that modifies physical computing device, not the computer-based system? It could be a computer-based system. For developing simulation models, all of it being on a physical computing device. But I understand you're reading it, the language developing simulation models is the only thing that's on the physical computing device. Do I understand that correctly? Yes. Yes, you understand that correctly. What about the last element where it talks about an executable process? Why doesn't the language, an executable process in and of itself, I mean you can't have something that's executable unless it's on a computer, right? Well, I disagree. Software is drafted. I can draft source code, and the source code I drafted is executable by a computer. Before you put it on the computer, it's executable. When you put it on the computer and click it, now you're executing it. It has always been executable. It's capable of being executed by a computer. It doesn't mean it is being executed by a computer. And that's the difference. The transition phrase from the preamble ends with the system comprising, and then it relates to just software non-tangible components. And here's an important part, Jaron, I want to focus the court's attention on. In the grade brief, in response to our argument that these claims are broad enough to cover software. Mr. Mudd, can you keep your voice down a little? Oh, I'm sorry. Keep your voice down a little. I know that you're very involved in this case. Yes, I get a little worked up. In the grade brief on page 3, Simio disputes our argument that the claims are broad enough to encompass the software inside the transmission signal, and they argue, quote, that argument does not align with the allegations in the complaint. Well, let's look at their complaint, their original complaint. The allegations in paragraphs 11, 26, and 27 identify FlexSim 2016, the simulation software, FlexSim 2016 as the accused product in paragraph 11, which is appendix 28. In paragraph 26 and 27 on appendix pages 31 and 32, they say that defendant's sale of FlexSim 2016 constitutes a direct infringement of the claim. They say that FlexSim 2016, the software product itself, includes all of the elements of Claim 1. They say that FlexSim 2016 is a computer-based system. Can I move you back to where I was before? I'm sorry, Judge Still, did you have more follow-up to that? No, no, sorry. I was going to do the exact same thing. Please go ahead, Judge. Okay. Some of us just see a lot of this Alice, Step 1, Step 2 analysis, and we're becoming much more familiar and at ease with that than anything else. So let me take you to Step 2 of Alice and the same limitation you were discussing with Judge Still, the executable process. It's a bit different from the abstract idea of just using graphical processes with object-oriented programming, isn't it? I disagree. Oh, go ahead. And if so, the question still remains whether it improves the computer's functionality. So could you kind of address that two-part thing? Yes. The executable process, I just heard my friend explain that that executable process is the same thing. It is a graphical process to achieve the result that they identify in the claim. And so it is just another statement of applying a graphical process with no explanation of the steps of that process or the implementation. It's in slightly more specific form than the abstract idea under Step 1, right? A little more specific. The problem with it is it's not specific in the way you achieve the result. It describes a specific result, Your Honor, but this court's jurisprudence over and over again in Alice Step 2 says that if you're going to focus on a limitation in Step 2 to try and be the inventive issue, the inventive idea, you can't just point to a result-oriented description. This court's decision in the Intellectual Ventures case versus Capital One in 2017 addressed a software claim where the benefit was the user didn't have to have programming skills. It made it more user-friendly. The court found it abstract, and the court found it ineligible under Section 101. And in that case, they cited to this dynamic document limitation, and the court said nothing in the claims indicate what steps are undertaken to overcome the incompatibility problem. The claim language proves only a result-oriented solution with insufficient detail. And that's exactly the way the executable process is written. It says it's an executable process to add new behavior to an object instance without changing the definition. So it's a process that achieves the result. Counsel, this is Judge Stoll. What kind of how-to limitation are you talking about? This looks pretty specific to me. I mean, it might not be an inventive concept because it's a foundational element of object-oriented programming. But, I mean, I want to know what you think. Can you give me an example of what sort of claim language you're thinking about that would make it so it was more clear how to perform this step? Well, Your Honor, so I agree with you. The reason it's not inventive is multifaceted. This is not the foundation of the invention. It's identified as just a possible more desirable thing that you could otherwise do. But if you say we are going to apply a process that achieves the result of adding a new behavior without changing the definition, then it's not telling you how to do that. For example, it's not telling you to substitute certain logic in this object instance in a way that won't relate back to the definition. It's not telling you how to add it or where to add it. Do you think a person of ordinary spelling art would know how to do it? It seems like it's pretty basic object-oriented programming. So I'm just wondering, or maybe it's not in your view and it has to be spelled out more. So I'm wondering. Well, I think that's a two-edged sword in both ways cut against Simio because if it is something that an ordinary person of skill in the art would just know, then it's just another conventional process that they would know, and it's not adding an inventive element. And if it's not something they would know, then the claim limitation is not specific enough by way of telling you how to implement this process to achieve the result, and it's purely result-oriented. Either way, it doesn't cross ALICE-II threshold. This is Judge Clemenger. Your adversary referred in his opening argument to the fact, which is true, that you have admitted novelty with regard to this invention. So tell me what is the specific novel feature that you've admitted? Well, I would clarify that statement. We have acknowledged that the executable process limitation was the limitation the Patent Office cited as the basis for granting the claims because that's the one thing they didn't see directly in the prior art. And our arguments in the motion to dismiss were, it doesn't matter if that's considered novel or not. The novelty is not. Are you now saying you don't admit liability of novelty? Well, not in a sense of throughout the case, we're going to just admit that that's novel. We're saying for the purposes of our motion, we won't dispute the novelty of it. We can accept that it's novel for purposes of a Section 101 analysis because even if it's novel, this Court's jurisprudence is very clear. Novelty does not equate to an inventive concept. You have to show something that goes beyond the abstract idea. And my colleague just acknowledged that this is another application of a graphical process to achieve a result that you could otherwise achieve in object-oriented programming. So it's just another element that does just what the patent says. The basic concept is object-oriented programming has existed forever in simulation software, and all they did is apply graphical processing so a user doesn't have to know coding language. That's the same concept that this executable process limitation applies. The end result that it claims is an end result you could get without applying a graphical process. So in other words, it's not adding anything inventive beyond the abstract idea itself. And this abstract idea is just taking a decades-old process that makes computing easier for users to a broader base of users and says, hey, nobody's done this with object-oriented simulation yet. Let's do it. And the patent never says there was a real hurdle to overcome by combining these two, or there was technological difficulties. They just said, we're going to apply graphical processing in the object orientation the same way that it had been applied in the process orientation decades earlier to make object-oriented simulation more user-friendly. It is a pure abstract concept that is carried on even into that executable process limitation. The other thing I want to point out is at the hearing, the motion to dismiss hearing, appendix page 1806, Simio's counsel conceded that, quote, flowcharts were a conventional tool. So the inventive concept that they focus on, and he even focused on today for this executable process, the thing that he said makes it better, is that you used flowcharts instead of programming. But they admitted in the motion to dismiss hearing that the use of flowcharts is a conventional tool. There's not a factual dispute here. What they're claiming as the inventive concept is admittedly nothing more than the application of a conventional tool in a new field and nothing about the implementation of that tool changed the technology or the function of computers. There's nothing in the patent that says a computer's processor works faster, a computer's memory is more efficient, a computer operates differently than it otherwise would have. This is a pure user benefit, and this court's decisions in custom media text versus Dish Network this year says improving the user's experience is not sufficient to render an improvement in computer functionality. Intellectual Event Search versus Capital One says the same thing. If all you did with a user to manipulate the data without programming skills, that's insufficient. And that's exactly what these claims are. We believe the claims are pure software claims and don't fall into four categories of Section 101, and we also think that the claims are abstract under ALICE and for that reason are ineligible. And I see my time is up. If the court has any more questions, I'm happy to address them. Thank you. You have some time remaining, Mr. Oberdick. Thank you, Your Honor. Just a few points. Returning to the add-on process initially and to just clarify, it is correct that, as described earlier in Claim 1 of the 468 patent, there's a use of a flowchart to create an object. That's the graphical process. The add-on process allows for modification of a behavior of that object without having to go back to square one. You don't have to use the graphical process, that initial flowchart again. That executable process is not a foundational element of object-oriented processing. Others are able to practice that general concept without infringing on that add-on process. That is the unique aspect that was found by the Patent Office twice here, and that is the focus of what we're saying is part of the revolutionary aspect of the invention. And I know a lot of these arguments turn by way of analogies. I would direct the Court's attention respectfully to ENFISH as providing a more apt analogy, a more apt way of looking at this invention. In ENFISH, the claims focused on a data storage and retrieval system. Those system components were a means for configuring, according to a logical table, a plurality of logical rows, a plurality of logical columns, and a means for indexing. I would submit no less abstract than what we are talking about in the 468 patent when we talk about objects, executable add-on processes, and the like. In ENFISH, the specific focus was the enablement of programmers to construct databases in new ways that required less modeling and configuring of tables prior to launch. That was the improvement. I would submit that is directly analogous to what is being involved with the present patent. We have new ways to modify a behavior of an object. I acknowledge that it is a user benefit, but it is also an improvement to the simulation modeling technology that had been around for many, many decades. The add-on process is new. It is revolutionary. It does simplify, expedite that technology in a way that was not present before. With that, I will ask if there are any other questions. Thank you. We thank both sides, and the case is submitted. That concludes our proceedings for this morning. Thank you. The Honorable Court is adjourned until tomorrow morning at 10 a.m.